Kenneth Blanchard v. Commissioner.
Blanchard v. Commissioner
Docket No. 24010.
United States Tax Court
1953 Tax Ct. Memo LEXIS 246; 12 T.C.M. (CCH) 550; T.C.M. (RIA) 53176; May 21, 1953
Harold M. Blanchard, Esq., for the petitioner. Charles R. Johnston, Esq., and Maurice S. Bush, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent has determined deficiencies in income tax and additions to tax for negligence and for substantial underestimate of estimated tax against the petitioner as follows: Addition to
tax for sub-
Addition to
stantial under-
tax for
estimate of
Deficiency
negligence
estimated tax
1943
$6,959.54
$347.98
1944
7,585.77
379.29
1945
9,703.07
485.15
$739.06
The deficiency for 1943 was determined under the provisions *247 of the Current Tax Payment Act of 1943. By an amended answer the respondent has asked that the deficiency in income tax determined for 1943 be increased by $14.70, that the addition to tax for 1943 for negligence be increased by $195.13 and that additions to tax for fraud be determined in the amounts of $3,487.12, $3,792.89 and $4,851.54 for 1943, 1944 and 1945, respectively. By an amendment to the amended answer the respondent has asked that the deficiency in income tax determined for 1945 be increased by $1,747.95, that the additions to tax determined for that year for negligence and for substantial underestimate of estimated tax be increased by $87.40 and $104.88, respectively, and that an addition to tax for fraud in the amount of $5,725.51 be determined for the year. Issues presented for determination are the correctness of the respondent's action in determining: (1) That during 1942 through 1945 the petitioner realized taxable income from his profession which he did not report in his income tax returns for those years, (2) the amounts deductible by petitioner as rent for 1942 and 1943, (3) the amounts deductible as interest for 1942 through 1945, (4) the amounts deductible *248 as taxes for 1942, 1943 and 1945, (5) the amounts deductible as club dues for 1942 through 1945, (6) the amount deductible as depreciation of office equipment for 1942, (7) the amounts deductible as depreciation of automobile for 1943 through 1945, (8) the amount deductible as a bad debt for 1943, (9) the amounts deductible as contributions for 1944 and 1945, (10) the amounts deductible for drugs and supplies for 1944 and 1945, (11) the amount deductible as automobile expenses for 1945, (12) that the total of expenses deducted on line 17, Schedule C, page 3, of petitioner's income tax return for 1944 was erroneously overstated, (13) the amounts of capital gain realized by petitioner in 1944 and 1945, (14) that petitioner is liable for an addition to tax for substantial underestimate of estimated tax for 1945, (15) that petitioner is liable for additions to tax for negligence for 1943 through 1945, and (16) whether petitioner is liable for additions to tax for fraud for 1943 through 1945. General Findings of Fact The petitioner's income tax returns for the calendar years 1942 through 1945, prepared on the cash basis, were filed with the collector for the fifth district of New Jersey. *249 The petitioner is a duly licensed physician and since 1928 has specialized in the medical care of infants and children, a branch of medical practice commonly known as pediatrics, with an office in East Orange, New Jersey. Issue 1. Unreported income from profession Findings of Fact During the years 1942 through 1945 the petitioner employed an office attendant. She acted as receiptionist, kept appointment records, answered the telephone, received and made records of payments to the petitioner and otherwise assisted him. During said years the petitioner had seven different office attendants due to wartime conditions. There was also a great shortage of physicians during those years. The petitioner had one class of patients to whom he rendered services on the basis of annual contracts. Patients of this class were entitled during the contract year to unlimited office visits and to all the required inoculations, such as for diphtheria, whooping cough, tetanus and smallpox. Petitioner's usual contract charge was $60 for office visits of a child during the first year of its life and $25 for the second year. These contracts did not include fees for house visits for which there were extra *250 charges. Petitioner's other class of patients consisted of children whose parents were charged for each office visit. The number of this group greatly exceeded the number of the petitioner's contract patients, particularly in the later years of the period involved because petitioner began to discourage contract patient arrangements. Petitioner's standard fee for office visits by non-contract patients was $4 per visit where paid at the time of the visit and $5 per visit if charged. Petitioner's fee for house visits was $5, except in outlying districts for which it was $7. His fee for inoculations was $2 and sometimes $3. In the case of the removal of tonsils petitioner associated himself with a surgeon who operated while petitioner administered the anesthetic. The usual fee for the service of the two was $60 which was divided equally between them, with the petitioner billing and collecting the total amount from patients. Receipts for the payment of fees were issued only when request was made therefor. During the period 1942 through 1945 the petitioner kept the following records with respect to receipts from his medical practice, namely, original day sheets and permanent bookkeeping *251 records. The original day sheets were prepared daily by petitioner's office attendant who recorded thereon the petitioner's professional appointments for the day, cash payments received, payments received by mail, list of unpaid charges for office visits for which bills were to be sent, list of charges for house calls for which bills were to be sent. Every few months the original day sheets were destroyed by petitioner. Petitioner's successive office attendants during the period did not participate in transcribing or posting the data on the original day sheets to petitioner's permanent records. The petitioner's permanent bookkeeping records for the years involved herein fall into two divisions, namely, those for the period January 1, 1942 to September 20, 1942, and those for the period after September 20, 1942 through December 31, 1945. Those for the former period were posted on forms by a bookkeeping machine. They do not show the names of the petitioner's patients or the individual charges to, or the payments received from, them. They show only the total cash received each day and the total accounts receivable for each day. Because of the difficulty encountered in training constantly *252 changing office attendants in the use of the bookkeeping machine, the petitioner on September 20, 1942, discontinued the machine system of keeping his books. For the period from September 20, 1942 through December 31, 1945, the permanent bookkeeping records, sometimes referred to as financial diaries, consisted of loose-leaf sheets in binders to which postings were made from the day sheets. The financial diaries were kept in part by petitioner, in part by petitioner's wife, and in part by Mark Hooley, a public accountant. Three classes of information appear in the diaries, namely, (1) visits by patients to petitioner's office for professional services, (2) professional visits made by petitioner to the homes of patients, and (3) checks received through the mail by petitioner for services rendered. With respect to office visits, the following detail was shown: Name of patient and the address if an initial visit, nature of, and fee charged for, the visit, and whether fee was paid at the time of the visit or was charged to the patient. The financial diaries also recorded payments received from, and the balances due from, patients on the annual contract plan of payment. For the months *253 of September through December 1942 the petitioner has certain miscellaneous records relating to his receipts from his medical practice for those months, which duplicate some of the bookkeeping records heretofore described. Beginning about July 1942 and continuing through December 31, 1945, the petitioner kept permanent individual ledger cards for each patient. These ledger card records were adopted by petitioner in order to facilitate posting and billing and they duplicated the data contained in petitioner's financial diaries with respect to each patient. In addition to his bookkeeping and other financial records, but not as a part thereof, the petitioner also kept written medical records, sometimes designated medical case histories, for his patients. In the medical records were recorded data as to the height and weight of the patient, feeding formulas prescribed, prescriptions, inoculations, diagnosis of ailments and other similar medical data. In addition to the entries made on a patient's medical record at the time of an office visit, the petitioner, in some instances, recorded thereon information contained in reports from other physicians, reports by parents as to inoculations *254 made elsewhere, and laboratory reports. The petitioner maintained a telephone hour each day during which time he usually received numerous calls from parents of patients. He made no charge for consultations, or for treatments prescribed, over the telephone during the telephone hour. In prescribing treatments in exceptional cases during the telephone hour the petitioner had the medical record of the patient before him and made an entry thereon of the prescribed treatment. The petitioner's medical records were kept in binders and alphabetically according to the surnames of the patients. In all there were 29 volumes with medical records ranging over the span of the petitioner's practice in East Orange. From time to time as binders became faulty or there was no room for further volumes some of the case histories of patients who had not been in for two years, or known to have moved elsewhere, or to have gone to other doctors were removed and discarded. During the years involved herein the petitioner had many new patients. Approximately one-third of his patients during these years moved elsewhere. In some &nstances the case histories of those moving elsewhere were removed from petitioner's *255 binders and either given to the parents of the patients or sent to other physicians. No copies of the records so removed were retained by petitioner. Such medical case history records of the petitioner for the period September 21, 1942 through 1945 as he had at the time of the hearing herein do not show approximately 5,000 visits actually made by patients, or from 40 per cent to 50 per cent of the total number of visits by patients, recorded in his financial diaries for the same period. Such medical case histories contain 548 entires in 1943, 676 entries in 1944, and 1,154 entries in 1945 with respect to non-contract, non-charity patients for which no record appears in the petitioner's financial diaries for those years. Petitioner maintained a checking account at the South Orange Trust Company in South Orange, New Jersey, from January 1 to January 29, 1942. Thereafter the account was inactive. Throughout the years 1942 through 1945 the petitioner had a checking account at a branch in East Orange of the Fidelity Trust Company of Newark, New Jersey. The following is a statement of the petitioner's total bank deposits from all sources for the years 1942, 1943, 1944 and 1945, and *256 the portions thereof attributable to proceeds of loans, proceeds from sales of securities, and dividends and interest received: 1942
1943
1944
1945
Total bank deposits
$17,347.52
$24,596.36
$40,509.13
$72,972.08
Proceeds of loans
200.00
2,679.96
5,871.34
16,340.20
Proceeds from sales of securities
2,490.20
24,096.23
Dividends and interest
893.25
1,338.00
Subtracting the totals of proceeds of loans, proceeds from sales of securities and dividends and interest from total bank deposits leaves the remaining amounts of bank deposits for the respective years: 1942
$17,147.52
1943
21,916.40
1944
31,254.34
1945
31,197.65
Sometimes collections were deposited in petitioner's bank account by his office attendant and sometimes by him. Not all cash collections were deposited. The petitioner retained some for the cash payment of office and living expenses. In his income tax returns for the following years the petitioner reported the indicated amounts as the total receipts from his medical practice during such years: 1942
$18,699.95
1943
24,318.00
1944
26,939.70
1945
25,552.50
In determining *257 the deficiencies involved herein the respondent determined that during the following years the petitioner realized income from his medical practice in the indicated amounts which was not reported in his income tax returns for the respective years. 1942
$ 8,000
1943
10,000
1944
12,000
1945
12,000
Opinion The petitioner contends that he reported his income from his medical practice for the years 1942 through 1945 on the basis of his financial diaries or bookkeeping records, that those records with minor exceptions correctly reflected his income from that source, and that the respondent erred in determining that he received much greater amounts than reported. The respondent takes the position that the petitioner's bookkeeping records do not substantially correctly reflect his income from his medical practice, and that the petitioner did not report all the income he received from that source. The respondent determined that the petitioner's books did not correctly reflect his income. Accordingly, he determined the understatements in income for the respective years by starting with the petitioner's total bank deposits for the year. These were reduced by sums *258 determined to be attributable to sources other than the petitioner's medical practice. To the balance so remaining were added amounts determined as representing the portion of cash collections which were not deposited in the petitioner's bank account but were used for the cash payment of operating expenses incurred by petitioner in his practice and for the cash payment of personal living expenses. The petitioner's bookkeeping records prior to September 21, 1942, listed only amounts and totals and did not show the names of patients. Accordingly, there is no basis for determining as to whom the entries related. From September 21, 1942 through December 31, 1945, petitioner's original or basic records were the day sheets. Postings were made from these sheets to the petitioner's financial diaries or his permanent bookkeeping records. After the day sheets had been held for a few months they were destroyed and thereafter there was no basis upon which to test the accuracy of the postings therefrom to the petitioner's permanent bookkeeping records. The petitioner's medical case history records were not kept for financial purposes but as aids to the treatment of patients. Due to the withdrawal *259 of medical case histories to give to patients moving elsewhere or for forwarding to other physicians or for discarding to make room for new histories, the files of medical case histories for the years in question which the petitioner had at the time of the hearing were incomplete. Consequently, a mere comparison of the petitioner's bookkeeping records with his medical case histories would at best be an inconclusive test of the correctness of his bookkeeping records. To support his determination as to the insufficiency and incompleteness of the petitioner's medical income records and his determinations as to understatements of income, the respondent submitted the testimony of the mothers of a group of petitioner's patients. Their testimony shows that in a substantial number of instances entries in petitioner's medical case histories, for which there were no corresponding entries in his medical income records, represented office visits for which he had been paid his standard fee. Obviously, the foregoing does not establish what amounts of income would be found to have been omitted in the respective years if a similar investigation could have been made with respect to all such entries *260 contained in the case histories the petitioner had at the time of the hearing as well as those that had been withdrawn from his files for various reasons. However, it does show that the pet&t&oner was receiving payments in each year which were not being entered his medical income records and sustains the respondent's position that such records do not afford a reliable basis for determining income. The evidence further shows that a portion of the petitioner's cash collections were not deposited in his bank account but were withheld for the cash payment of expenses of his practice and the cash payment of living expenses. No record appears to have been kept of the amounts so withheld and expended by the petitioner. It is against the foregoing background that we are called on to determine the correctness of the respondent's determinations as to understatements of income. The following is a statement of the amounts reported by petitioner from his medical practice in his income tax returns for the indicated years, petitioner's bank deposits for such years after elimination of amounts not shown to have been attributable to other sources than his medical practice, in excess of income *261 reported over such deposits, and excess of such deposits over income reported: Excess of in-
Excess of
Bank deposits
come reported
deposits over
Year
Income reported
(after eliminations)
over deposits
income reported
1942
$18,699.95
$17,147.52
$1,552.43
1943
24,318.00
21,916.40
2,401.60
1944
26,939.70
31,254.34
$4,314.64
1945
25,552.50
31,197.65
5,645.15
Other than to state that the amounts were small, the petitioner did not estimate the amounts of cash collections in the respective years which were used for the cash payment of the expenses of his practice or the amounts used for the cash payment of living expenses. However, the evidence bearing on the question shows the total amounts of cash used for such purposes to have been about $6,000 in 1942, $6,600 in 1943, $7,300 in 1944, and $8,200 for 1945. Since in 1942 the total of petitioner's bank deposits, after eliminations, amounted to $17,147.52 and cash used for the payment of living expenses and expenses connected with petitioner's practice amounted to $6,000, the petitioner's total receipts from his practice were $23,147.52. Since for that year petitioner reported *262 $18,699.95 from that source, his receipts therefrom were understated to the extent of $4,447.57 and not $8,000 as determined by the respondent. In 1943 petitioner's total bank deposits, after elimination, were $21,916.40, cash payments of living expenses and expenses connected with his practice were $6,600, which made a total of $28,516.40 as receipts from his practice for the year. Since for that year the petitioner reported $24,318 from that source, his receipts therefrom were understated in the amount of $4,198.40 instead of $10,000 as determined by the respondent. For 1944 the petitioner's total bank deposits, after eliminations, were $31,254.34, cash payments of living expenses and expenses connected with his practice were $7,300, which made a total of $38,554.34 as receipts from his practice for the year. Since for that year the petitioner reported $29,939.70 from that source, his receipts therefrom were understated by $11,614.64 instead of $12,000 as determined by the respondent. For 1945 the petitioner's total bank deposits, after eliminations, were $31,197.65, cash payments of living expenses and expenses connected with his practice were $8,200, which made a total of $39,397.65 *263 as receipts from his practice for the year. Since for that year the petitioner reported $25,552.50 from that source, his receipts therefrom were understated by $13,845.15 instead of $12,000 as determined by the respondent. In an amendment to his amended answer the respondent asked that the understatement be found to be $14,689.15. Since the understatement is only $13,845.15, the respondent's request is granted to the extent that that amount is in excess of $12,000 is determined by respondent. Issue 2. Deductions for rent Findings of Fact During 1942 and 1943 the petitioner paid rent in the amounts of $1,200 and $1,680, respectively. In his income tax returns for each of the years he took a deduction of $1,440 for rent. In determining the deficiencies for the years in question the respondent disallowed $120 of the deduction taken in each year. Opinion The parties are in agreement that the petitioner is entitled to deduct as rent the amounts paid. Accordingly, the deduction taken for 1942 was excessive to the extent of $240 and the respondent erred in disallowing $120 of the deduction taken for 1943. Issue 3. Deductions for interest Findings of Fact In his income *264 tax return for 1942 the petitioner deducted $2,386.11 as interest paid and explained the deduction as representing $500 paid to George Becker and $1,886.11 as paid to Prudential Insurance Company, and two payments as interest on loans. In determining the deficiency for 1942 the respondent allowed a deduction as interest in the following amounts: George Becker
$ 500.00
Prudential Insurance Company
989.00
Village of South Orange (on taxes)
43.36
South Orange Trust Company
38.00
Mutual Finance Company
15.00
Morris Plan Bank
91.50
Savings Investment Trust Company
8.25
Total
$1,685.11 The remainder of the deduction taken by petitioner, $701, was disallowed by respondent. During 1942 the petitioner paid interest in the total amount of $40 to Fidelity Union Trust Company, New Jersey Loan Company, and West Hudson National Bank. During the same year the petitioner paid the Village of South Orange $5.19 as interest on property taxes. In his 1943 return the petitioner took a deduction for interest in the amount of $2,460.43 which was explained as follows: George Becker
$ 750.00
Prudential Insurance Company
1,438.83
Morris Plan Bank
122.00
New Jersey Loan Company
26.60
Medical Building Corporation
12.00
Essex County Trust (branch of
Fidelity Union Trust Co.)
48.00
Sun Life Insurance Company
63.00
Total
$2,460.43
*265 During 1 43 the petitioner paid George Becker and Prudential Insurance Company interest in the amounts of $500 and $1,128.38, respectively. In the same year the petitioner also paid the Village of South Orange $4.65 as interest on property taxes. In determining the deficiency for 1943 the respondent disallowed $237.20 of the deduction of $2,460.43 taken by petitioner as interest for that year. In his income tax return for 1944 the petitioner deducted as interest $1,786.15, which was explained as follows: George Becker
$ 500.00
Prudential Insurance Company
911.34
Sun Life Insurance Company
123.11
National City Bank
191.34
Fidelity Union Trust Company
60.36
Total
$1,786.15
During 1944 the petitioner paid Prudential Insurance Company $841.08 instead of the larger amount deducted in his return. In the same year the petitioner paid the Village of South Orange $40.70 as interest on property taxes. In determining the deficiency for 1944 the respondent disallowed $70.26 of the total of $1,786.15 deducted by petitioner as interest for that year. In his return for 1945 the petitioner deducted $2,179.44 as interest which was explained as follows: George Becker
$ 755.18
Prudential Insurance Company
1,008.67
Sun Life Insurance Company
80.25
National City Bank
262.89
Fidelity Union Trust Company
72.45
Total
$2,179.44
*266 During 1 45 the petitioner paid interest of $500 to George Becker instead of the larger amount deducted. In determining the deficiency for 1945 the respondent disallowed $255.18 of the total of $2,179.44 deducted by petitioner as interest for that year. Opinion On brief the petitioner contends that the amounts deducted as interest in his returns for the respective years are correct and are properly allowable for such years. The evidence fails to sustain such contention. In disallowing a portion of the deductions taken for each of the years the respondent did not state in the deficiency notice what items or portions of items were disallowed. However, the evidence shows that some items were deducted in amounts larger than actually paid and it appears that for the most part it was such excess that was disallowed by respondent. With the exception of 1942 the respondent does not appear to have made allowance for interest paid to the Village of South Orange on property taxes. In our findings we have set out the amounts of such interest as shown by the record, and in recomputing petitioner's tax liability for the years in question effect will be given to our findings. Issue 4. *267 Deductions for taxes Findings of Facts During 1942 the petitioner paid $453.60 as real estate taxes to the Village of South Orange. However, in his income tax return for that year he deducted $650 for such taxes. The respondent disallowed $196.40 of the deduction taken. In his 1943 return the petitioner deducted as taxes $216.84 which he explained as follows: Social security $11.44, City of East Orange $30.40, and sales and admissions $175. The respondent allowed $116.84 of the deduction and disallowed $100. The latter apparently was a portion of the amount representing sales and admission taxes with respect to which the petitioner maintained no records. During 1943 the petitioner paid $318.60 as real estate taxes to the Village of South Orange. During 1945 the petitioner paid to the Village of South Orange $1,135.28 as real estate taxes and $57.38 as interest on real estate taxes, or a total of $1,192.66. In his income tax return for that year the petitioner deducted $1,206.42 as real estate taxes. The respondent disallowed the portion of the deduction in excess of $1,192.66, or $13.76. Opinion The facts show that the petitioner over-stated his deduction for taxes for *268 1942 by $196.40 and that the respondent correctly disallowed that portion of the deduction. The evidence does not show that respondent erred in disallowing $100 deducted for 1943 for sales and admission taxes. However, for 1943 the petitioner is entitled to deduct $318.60 for real estate taxes paid to the Village of South Orange. The respondent did not err in disallowing $13.76 of the deduction taken for real estate taxes in 1945. Issue 5. Deductions for club dues Findings of Fact The following is a statement of the amounts deducted by petitioner for dues and, as such, expenses of his practice and the amounts thereof which were disallowed by respondent for the indicated years: Deducted by
Disallowed by
petitioner
respondent
1942
$175.11
$175.11
1943
421.36
350.00
1944
433.21
350.00
1945
525.41
450.00
During 1943, 1944 and 1945 the petitioner paid to the following clubs or other organizations the indicated amounts: 1943
1944
1945
Orange Lawn Tennis
Club
$262.26
$212.35
$231.75
Lake Placid Club
80.48
27.75
Seigniory Club
411.35
American Medical
Association
17.25
American Academy of
Pediatrics
20.00
25.00
Association of Ameri-
can Physicians and
Surgeons
10.00
Essex County Medical
Society
30.00
Harvard Fund Council
5.00
Harvard Club of New
Jersey
3.00
3.00
American Philatelic
Society
3.00
New Jersey Society -
Sons of American
Revolution
5.00
American Legion Post
#220
5.00
Wm. Pinson Library
Association
5.00
Society for Relief of
Widows and Orphans
of Medical Men of
New Jersey
6.00
Lake Placid Commu-
nity Chest
10.00
Physicians Underwrit-
ing Agency
12.00
$342.74
$345.35
$697.10
*269 Orange Lawn Tennis Club is located in South Orange, New Jersey, and had a dining room and facilities for tennis and swimming. Annual membership dues, including the privilege of all facilities, were $155 per year. A great many of the parents of patients of the petitioner were members of the club. During the years 1943 through 1945 the petitioner, once or twice each year, entertained the parents of between five and ten of his patients at the club. Petitioner's membership included the privileges of the club for his wife and three children. The petitioner joined the club for such benefit as he might obtain professionally and also that his children might have the advantages of the club's facilities. The petitioner used the club for his personal pleasure and entertainment and on various occasions took his family with him. On many occasions they went without him. Lake Placid Club is located in Lake Placid, New York. Annual membership dues were $48 and petitioner's membership entitled his wife and three children to the club's facilities. Petitioner continued his membership in the club until it and its facilities were taken over by the Government. The petitioner went to Lake Placid for *270 his vacations, which were from one to three weeks in length, and occasionally went there during the winter for sports. The petitioner's family usually accompanied him when he went there. While at Lake Placid Club the petitioner came in contact with some physicians he had previously known in New York and met some he had not known before. Seigniory Club is a fishing and hunting club located on the Ottawa River in Canada. Annual membership dues were about $75. The petitioner went to the club in 1945 with his family for hunting, fishing and swimming. All payments made to the club in excess of membership dues were for the personal expenses of himself and his family and for entertaining. While at the club the petitioner met some physicians from Massachusetts. The Physicians Underwriting Agency furnished the petitioner emergency automobile service. Opinion The petitioner has furnished no evidence from which we can determine the propriety of the respondent's action in disallowing the deduction taken for 1942. Accordingly, the disallowance for that year is sustained. For amounts expended as social club dues to be deductible as business expenses, it must appear that they had a direct *271 relation to the conduct of the business or to the business benefits which were expected from the expenditures. Louis Boehm, 35 B.T.A. 1106. Such a relationship has not been shown with respect to the payments to Lake Placid Club and the Seigniory Club. Petitioner has not shown that his membership in these clubs has had any effect on his business whatsoever or that he joined the clubs for a business purpose. These were social clubs and so far as appears the benefits resulting to petitioner from them appear to have been social and recreational rather than financial. We find no basis for allowing a deduction of any portion of petitioner's payments to them. The situation was somewhat different with respect to the Orange Lawn Tennis Club. Each year the petitioner entertained the parents of a number of his patients there. Also, the parents of many of his patients were members. However, it also appears that the petitioner and his family made considerable use of the facilities of the club for purposes that bore no relationship to the petitioner's medical practice. In view of this, and making as fair an allocation as possible from the evidence, we hold that $50 of the petitioner's *272 annual membership dues of $155 for the years 1943, 1944 and 1945 is deductible as a business expense. From a statement made by respondent's counsel at the hearing and now acquiesced in by petitioner, it appears that there has been no disallowance of deductions for dues paid to medical societies, which amounted to $77.25 for 1944 and $25 for 1945. The payment of $12 to the Physicians Underwriting Agency in 1944 was deductible as an expense of the petitioner's practice. The payments of $5 to Harvard Fund Council in 1944 and $10 to the Lake Placid Community Chest in 1945 were deductible as contributions. The evidence as to the remaining payments is either insufficient to show that they were deductible or shows that they were not deductible. Accordingly, it is held that they were not deductible. Issue 6. Deduction for depreciation of office equipment Opinion The respondent disallowed as excessive $20 of a deduction of $90 taken by petitioner in his 1942 tax return as depreciation on office equipment. The petitioner submitted no evidence on this issue. The respondent's determination must be sustained. Issue 7. Deductions for depreciation of automobile Findings of Fact *273 The petitioner had two automobiles, a Buick and a La Salle. The Buick was used almost exclusively by petitioner in his practice. The La Salle was for the personal use of the petitioner and his family but was used by petitioner in his practice when the Buick was being repaired. In each of his returns for 1943, 1944 and 1945 the petitioner deducted $400 as depreciation on the Buick automobile. In each return the automobile was shown as having been acquired in 1940 at a cost of $1,200 and the estimated life used in computing depreciation was shown as three years. The automobile was purchased by petitioner in June 1941 and had been used prior to its sale to him. The petitioner used the automobile in his practice throughout 1945. The respondent disallowed $100 of the deduction taken in 1943, $250 of that taken in 1944, and the entire deduction taken in 1945. The petitioner was entitled to a depreciation allowance for 1945 of $200 on his Buick automobile. Opinion The petitioner contends that the respondent erred in failing to allow deduction of the full amount of $400 taken for depreciation in each of the years 1943 through 1945. The record is silent as to the depreciation allowed *274 or allowable with respect to the automobile for the period in 1941 following its purchase by petitioner. In his 1942 return petitioner claimed and was allowed depreciation of $375. That amount plus $400 a year for the three years 1943 through 1945 totals $1,575, or $375 in excess of the $1,200 shown in petitioner's return as the cost of the automobile. The record is silent as to the extent of the petitioner's use of the automobile or the mileage it was driven during 1943 and 1944. While the petitioner testified that he drove it approximately 1,800 miles per month in 1945, he did not state whach its estimated useful life was at the end of that year or its estimated salvage value at tha time. From the meager facts presented we are unable to find that respondent erred as to his disallowances for 1943 and 1944. Since it is shown that the automobile was used throughout 1945, we think the respondent erred in not allowing some amount as depreciation for that year. The fact that allowances for prior years might have been excessive and their total was equal to or in excess of cost does not preclude a reasonable allowance in 1945. Land Improvement & Supply Co., 18 B.T.A. 963. From *275 the limited facts presented we have found such allowance to be $200. Issue 8. Deduction for bad debts The petitioner concedes the correctness of the respondent's disallowance of a deduction of $862 taken for 1943 for bad debts. Issue 9. Deductions for contributions Findings of Fact In his return for 1944 the petitioner took a deduction of $687 for contributions which was explained as made to "Various Churches and Charities." In his return for 1945 he deducted as contributions the amount of $879 which was explained as made to "Various Charities." For each year the respondent allowed $500 of the deduction taken and disallowed the balance of $187 for 1944 and $379 for 1945. Opinion The petitioner contends that the respondent erred in his disallowances for 1944 and 1945. In support of his position the petitioner relies on a statement from the treasurer of the First Presbyterian Church, East Orange, New Jersey, and certain cancelled checks which he put in evidence. The statement recites that petititioner's contributions to the church amounted to $256.38 in 1944 and $357.05 in 1945. The group of cancelled checks issued in 1944 total $274.73 and the group issued in 1945 total *276 $283.50. Each group of checks contains some which were made payable to the First Presbyterian Church. Checks so payable and issued in 1944 totaled $78.35 and those issued in 1945 totaled $78. So far as appears the foregoing amounts were included in the amounts recited in the statement of the church treasurer. The group of checks issued in 1944 contains one for $25 and the group issued in 1945 contains one for $35 which represents the petitioner's donations to provide Christmas gifts for the elevator operators and other employees about the building in which the petitioner had his office. Such amounts constituted personal gifts by petitioner and were not allowable deductions. The group of checks issued in 1945 contain checks totaling $63 representing payments by petitioner to the publisher of a local newspaper which conducted a campaign against child delinquency. Without further information we are unable to conclude that such payments constituted allowable deductions. The petitioner was unable to state for what purpose a check for $5 was issued in 1944 and one for $1.50 was issued in 1945. After eliminating from their respective groups the above-mentioned checks payable to *277 the church, those issued for Christmas gifts, those issued to the newspaper publisher and those whose purpose the petitioner was unable to state, the total of the remaining checks and of the amounts shown by the statement of the amounts shown by the staement of the church treasurer is $422.86 for 1944 and $463.05 for 1945. Although the petitioner testified that the total of his donations made by check and in cash amounted to the deductions taken in his returns for the respective years, he did not state the name or names of the organizations to which he made cash donations nor the amounts he paid to each. In the situation presented we cannot find that the respondent erred in disallowing the portions of the deductions here in controversy. Issue 10. Deductions for drugs and supplies Findings of Fact In his returns for 1944 and 1945 the petitioner deducted as an expense of his practice $1,455.60 and $1,545.78, respectively, for drugs and supplies. The respondent disallowed $500 of the deduction taken for 1944 and $600 of that taken for 1945. The petitioner expended $1,100 for drugs and supplies in each of the years 1944 and 1945. Opinion The petitioner contends that the deductions *278 taken by him in 1944 and 1945 for drugs and supplies were proper and that the respondent erred in disallowing a portion thereof. According to the testimony of the petitioner, he issued checks in payment of a portion of his purchases of drugs and supplies and paid cash for the balance. He did not keep records of all cash purchases but only of an undisclosed part thereof. At estimated cash purchases at about $15 to $20 a week for the respective years. He also placed in evidence a letter from a laboratory and pharmacy from which he stated he made most of his purchases, and in which it was estimated that petitioner's cash purchases from it "probably amounted to around $70 per month but the amount might be more or less." The petitioner has submitted cancelled checks indicating that the purchases paid for by check amounted to approximately $480 for 1944 and $250 for 1945. From that and the other evidence before us we think the petitioner spent at least $1,100 in each of the years for drugs and supplies. Issue 11. Deduction for automobile expenses Findings of Fact In his return for 1945 the petitioner deducted $1,469.61 for automobile expenses. The respondent disallowed $500 of *279 the deduction. The petitioner paid automobile expenses of $1,050 in 1945. Opinion The petitioner placed in evidence a group of cancelled checks totaling $615.28 which were issued in payment of automobile expenses. He stated that in addition to the expenses paid by check he also paid other expenses with cash. No record was kept of the cash payments. In preparing his return the petitioner estimated the amount of the cash payments, using data as to mileage and the prices of gasoline and oil which were destroyed after the return was prepared. At the hearing the petitioner estimated that he drove his automobile an average of about 1,800 miles a month in 1945 and that the cash payments of expenses amounted to about $45 to $50 a month. From the evidence before us we have found that petitioner paid $1,050 of automobile expenses in 1945. Issue 12. Overstatement of total expenses Findings of Fact The petitioner overstated by $18 the total amount of expenses deducted on line 17, Schedule C, of his 1944 return. Issue 13. Capital gains Findings of Fact In his return for 1944 the petitioner reported a gain of $544.07 from the sale of capital assets. The respondent determined *280 that the gain had been overstated by $241.79. In his return for 1945 the petitioner reported a gain of $2,869.84 from the sale of capital assets. The respondent determined that the petitioner realized a gain of $5,478.73 from the sale of such assets. The petitioner's mother, Anna Walker Blanchard, died testate on December 4, 1942. At the time of her death she owned 203 shares of common stock in Travelers Insurance Company of Hartford, Connecticut. The executors of her estate did not elect to have her gross estate valued in accordance with the values as of a date or dates subsequent to her death as authorized by section 811 (j) of the Internal Revenue Code. Part of the Travelers stock was pledged as collateral for a promissory note in the amount of $26,000 executed by the decedent on September 8, 1942, to the National City Bank of New York. Petitioner inherited 50 shares of the stock subject to liability for payment of $6,500 of the amount of the promissory note. On June 7, 1945, the petitioner sold the 50 shares of stock for $28,845, or $576.90 per share, and on the same date paid the National City Bank $6,500 in discharge of his liability with respect to *281 the note. In reporting his gain from the sale of Travelers stock the petitioner used as his basis $24,250, or $485 per share, which was the fair market value of the stock at the time it was distributed to him on June 10, 1943. In determining the petitioner's gain from the sale of the stock the respondent determined the petitioner's basis to be $21,000, or $420 per share, which was the fair market value of the stock on the date of death of the petitioner's mother. On June 12, 1945, the petitioner purchased 25 shares of stock in Arlington Mills for $2,031.25, or at $81.25 per share, and on June 19, 1945, purchased an additional 25 shares of such stock for $2,275, or at $91 per share. In the latter part of 1945 William Whitman Company, Inc., made an offer, which expired on December 1, 1945, to purchase stock in Arlington Mills at $120 a share. On December 18, 1945, that company accepted an offer by petitioner to sell his 50 shares of stock in Arlington Mills at $120 a share and on that day he was paid for the stock at that price. In reporting his gain from the sale of the Arlington Mills stock the petitioner showed the entire 50 shares as having been acquired on June 15, 1945, and *282 as having been sold on December 17, 1945, and he reported the entire gain as having been realized from the sale of a capital asset held for more than six months. The respondent determined that the petitioner disposed of his stock on December 1, 1945, and tha the gain thereon was from the sale of a capital asset held for less than six months. Opinion Although the petitioner has assigned error as to the respondent's determination that he (petitioner) overstated capital gain for 1944, the petitioner offered no proof on the matter and makes no argument with respect thereto on his brief. Accordingly, we conclude that the petitioner has abandoned the issue and sustain the action of the respondent. The issue presented with respect to the stock in Travelers Insurance Company, which the petitioner inherited from his mother, is whether the value of the stock at the time of his mother's death or its value at the time it was distributed to him is the proper basis for computing his gain on the sale thereof. The proper basis is the fair market value at the time of the mother's death. Malcolm Clifton Davenport, 6 T.C. 62. The issue with respect to the Arlington Mills stock *283 is as to the period of holding. The respondent determined that all of the 50 shares were disposed of by petitioner on December 1, 1945. However, the facts show that all of it was sold on December 18, 1945. As to the 25 shares of the stock purchased by petitioner on June 12, 1945, the period of holding by petitioner clearly was for more than six months. As to the 25 shares purchased on June 19, 1945, the petitioner's period of holding was for less than six months. Harriet M. Hooper, 26 B.T.A. 758; Fogel v. Commissioner, 203 F. (2d) 347 (C.A. 5, April 8, 1953). Issue 14. Addition to tax for substantial understimate of estimate tax Opinion The petitioner contends that the respondent erred in determining that he was liable for an addition to tax for 1945 because of a substantial understimate of his estimated tax for that year. Section 294 (d) (2) of the Internal Revenue Code provides: "Substantial Understimate of Estimated Tax. - If 80 per centum of the tax (determined without regard to the credits under sections 32 and 35), in the case of individuals * * * exceeds the estimated tax (increased by such credits), there shall be *284 added to the tax an amount equal to such excess, or equal to 6 per centum of the amount by which such tax so determined exceeds the estimated tax so increased, whichever is the lesser. * * *" On his return for 1945 the petitioner reported a tax liability of $4,813.44, that $2,198.86 had been paid on his declaration of estimated tax, and that the balance of tax due was $2,614.58. Aside from the foregoing we have no information as to the amount of the petitioner's estimate of his estimated tax. If the amount shown as paid be accepted as the amount at which he estimated his tax, it is apparent that, aside from any deficiencies in tax that may be finally determined in this proceeding for that year, the petitioner underestimated his tax by more than one-half of the amount of tax reported by him on his return. The respondent did not err in his determination that petitioner was liable for the addition to tax in question. Issues 15 and 16. Additions to tax for negligence and for fraud Findings of Fact The petitioner does not know bookkeeping or accounting. In the latter part of 1942 he employed Mark Hooley to keep a record of his accounts receivable, prepare his income tax returns, *285 and social security and withholding tax returns. Hooley was an accountant and tax consultant. He had been in the accounting business since about 1910 and was regarded as competent in those fields. Hooley also at times over the period 1943 throug 1945 made postings from petitioner's day sheets to the bookkeeping records of his medical practice. Because postings were made from the day sheets to the bookkeeping records, Hooley did not deem it essential tha the day sheets be retained by the petitioner longer than a few months, as he thought that errors in recording charges, payments and credits on the day sheets or errors in postings from the day sheets to the bookkeeping records or in billings would be cleared up in that time. As a consequence, the petitioner destroyed the day sheets after a few months. Periodically over the years 1943 through 1945, as his business permitted, Hooley removed sheets from the bookkeeping records and totaled them by months so as to reduce the amount of work that otherwise would be required at the end of the year. Hooley prepared the petitioner's income tax returns for 1943, 1944 and 1945. After the close of each year he spent from one to three days with *286 the petitioner going over matters relating to the returns. During this time the petitioner went over his cancelled checks and other data with Hooley. Such items as Hooley considered to be allowable deductions from income he listed on columnar sheets. Using the data thus compiled and the amount which he had computed to be the total receipts from petitioner's medical practice, Hooley prepared petitioner's returns. However, in the case of the petitioner's gains from the sales of capital assets in 1944 and 1945, Hooley made a detailed examination of all the brokerage purchase and sales slips relating thereto. Except in the case of such gains, Hooley apparently did not deem it necessary to make a detailed examination of petitioner's income from his medical practice and other sources. In totaling the receipts shown in petitioner's records of his medical practice for 1944, Hooley, or an employee of his, erroneously computed the amount at approximately $2,500 less than the correct amount and the error was carried forward into petitioner's return for that year. The respondent determined additions to the petitioner's tax for negligence for 1943, 1944 and 1945. Opinion By an amended *287 answer the respondent has asked that additions to tax for fraud be determined for 1943, 1944 and 1945. On brief, he asks that the additions to tax for negligence determined for those years be sustained only in event it is determined that the petitioner is not liable for the additions for fraud. Section 293 of the Internal Revenue Code provides as follows: "(a) Negligence. - If any part of any deficiency is due to negligence, or intentional disregard of rules and regulations but without intent to defraud, 5 per centum of the total amount of the deficiency (in addition to such deficiency) shall be assessed, collected, and paid in the same manner as if it were a deficiency * * *. "(b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid * * *." The fraud meant by section 293 (b) "is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. Mere negligence does not establish either." Mitchell v. Commissioner, 118 Fed. (2d) 308. *288 See also Wiseley v. Commissioner, 185 Fed. (2d) 263. In support of his position as to fraud, the respondent contends that the petitioner failed to report in each of the years as receipts from his practice an average amount of $4 with respect to several hundred entries in petitioner's medical case histories for which there were no corresponding entries records. The respondent has the burden of establishing fraud. Section 1112 of the Internal Revenue Code. Fraud is not to be presumed but must be established by clear and convincing evidence. Henry S. Kerbaugh, 29 B.T.A. 1014, affd. 74 Fed. (2d) 749; Walter M. Ferguson, Jr., 14 T.C. 846. The respondent has shown that a substantial portion of a limited number of entries in petitioner's medical case histories for which there were no corresponding entries in his bookkeeping records represented office visits, for which the petitioner was paid the standard price of an office visit, and that the petitioner failed to report such payments as income. The immediate question is whether such failure was due to intent to evade tax. The evidence shows that the petitioner *289 was very busy during the years in question. Due to wartime conditions there were frequent changes in his office attendants who generally did not measure up to the usual standard of proficiency of such help. On various occasions bills to parents of patients were cancelled when the parents reported that payment had been made previously for the visits covered by the bills. The petitioner employed Hooley, a public accountant and tax consultant who had been in business for many years, to go over his income tax data with him and to prepare his returns. The petitioner testified that he submitted all his data to Hooley for his use in preparing the returns. Hooley's testimony shows that he spent from one to three days each year in going over the data with the petitioner, that he alone decided what items were deductible, and that he made a complete investigation as to petitioner's income from the sale of capital assets. At no point in his testimony did Hooley indicate that petitioner failed to turn over to him or to obtain for him any data requested. We are satisfied that Hooley had full access to all data bearing on the petitioner's tax liability, and that petitioner cooperated fully with *290 him in the preparation of his income tax returns. However, it is far from clear that Hooley elected to utilize the available data to the fullest extent. While he decided to make a complete examination as to one source of petitioner's income, capital gains, he apparently never considered comparing total bank deposits with the total amounts he had computed to be the petitioner's income from his medical practice. If he had done so, we think he would have discovered not only the disparities existing between the two totals but would have found that income was being received which was not recorded, and could have taken the proper steps to prepare correct returns. The record indicates that the petitioner's method of keeping records was of a type that required considerable year-end investigation and examination to establish its accuracy. That Hooley decided to make only a limited investigation was, we think, bad judgment on his part. While the record shows that the petitioner did not give close attention to recording his outlays for expenses, he apparently did not give any attention to what his total deposits were for the respective years. It seems to us that if he had intended to evade *291 tax, he would have conformed the deposits made in his bank more nearly to what his medical income records showed. The petitioner employed Hooley because of his long experience as an accountant and tax consultant and because he considered him capable in those fields. Under these circumstances we think he was justified in relying on him to correctly prepare his returns. The fact that Hooley exercised bad judgment or made mistakes in their preparation may not be regarded as constituting fraud of the petitioner. Davis v. Commissioner, 184 Fed. (2d) 86. The respondent's request for a determination that the petitioner is liable for additions to the tax for fraud is denied. From the facts before us we are unable to conclude that the petitioner was liable for additions to the tax for negligence for the years 1943, 1944 and 1945. The respondent did not determine a deficiency in tax for 1942 or any addition to tax for that year because of negligence. However, since petitioner's tax for 1943 is to be recomputed under the provisions of the Current Tax Payment Act of 1943, effect is to be given to any increase in tax for 1942 resulting from our holding herein that the deduction *292 taken for that year for rent was overstated. Since there is no showing as to what the overstatement resulted from, we cannot find that the petitioner was liable for an addition to the tax for that year for negligence. Decision will be entered under Rule 50.